**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**GREENBELT DIVISION**

IBRAHIMA DIENG,
13104 Chalkstone Way
Silver Spring, MD 20904

Plaintiff,

v.

WESTERN INDUSTRIES-NORTH, LLC
(dba WESTERN PEST SERVICES),
ORKIN LLC,
ROLLINS INC.,
202 Perry Parkway #2
Gaithersburg, MD 20877

Defendants.

Civil Action No. 21-cv-0482-TDC

**FIRST AMENDED COMPLAINT FOR RELIEF FROM**
**DISABILITY AND RACE DISCRIMINATION IN EMPLOYMENT**

1. Ibrahima Dieng is a knowledgeable and kind pest control technician who was employed by Western Industries-North LLC ("Western Pest" or "Western Pest Services"), Orkin LLC ("Orkin"), and Rollins Inc. ("Rollins") (collectively, "Defendants"). He was one of Western Pest Services' best technicians, who exceeded customers' expectations and even stopped other tech's customers from cancelling contracts with the company. Clients loved his work and were highly satisfied with his performance. However, after an accident at work in which he tore his left knee meniscus and was unable to get prompt attention for it through workers compensation, Dieng's left knee injury resulted in long-term damage and disability to both knees, a bruised right kneecap, and an order from his doctor that he perform a light duty job. Instead of providing accommodations for a light-duty position, Defendants simply ignored

his requests, refused to do anything, and discharged him from employment. Defendants' actions violated the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* (ADA), as amended by the ADA Amendments Act of 2008.

2. Defendants also refused Dieng employee benefits provided to his coworkers, failing to pay him the employee referral bonus for two employees he helped Defendants to recruit on account of his race and/or national origin. The bonuses were instead paid to an African American female coworker. These actions violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and Plaintiff now seeks relief for all of the discrimination and injuries he has suffered.

**JURISDICTION, VENUE AND PARTIES**

3. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 42 U.S.C. § 12117, and 42 U.S.C. § 2000e-5(f)(3). Venue is proper in this District under 28 U.S.C. § 1391(b), because the events that gave rise to Plaintiff's claims occurred in this district.

4. Plaintiff, Ibrahima Dieng, is a resident of Maryland who was employed with Defendants in Maryland. Plaintiff is African, originally from Dakar, Senegal. During Plaintiff's employment, he was associated with both Western Pest and Orkin: Plaintiff utilized Orkin forms, wore a uniform that bore Western Pest's logo, had a uniform that bore Orkin's uniform, and drove an Orkin truck. Communications with his supervisors included email addresses from both Orkin and Western Pest domains. Plaintiff suffers from a chronic condition to his knees and back affecting his ambulation, mobility, and major life activities.

5. Defendants are three interrelated, affiliated pest control services that provide both residential and commercial pest control services. Both Western Pest Services and Orkin are wholly owned subsidiaries of Rollins Inc. Defendants are an employer as defined in 42 U.S.C.

§ 12111(5), and employ more than 14,000 employees. At all relevant times, Defendants operated as integrated employers, employed Plaintiff, and all three are liable for any violation of the law.

## FACTUAL BACKGROUND

6. Plaintiff Ibrahima Dieng was a valued member of Western Pest's team, serving as a commercial and residential pest control specialist for buildings in Washington DC and Maryland. Dieng was part of a team that ran daily routes for the company as well as answering daily random service calls, servicing Defendants' customers' properties for pest control. Dieng had excellent job performance, and kept his routes with nearly no cancellations. He sustained great rapport with his customers.

7. His duties included, but were not limited to, operating a company vehicle to get to commercial and residential structures, servicing rodent stations, addressing pest issues, communicating with customers, suggesting fixes, safely treating affected areas, carrying equipment, inspecting common areas and outside perimeter, placing monitors, and advising and educating customers about Defendants' integrated pest management approach. Dieng was responsible for assessing the situation at customers' properties and then applying chemicals, treatments, and other pest control measures. He also sold various other services, such as intensive after hour treatments, gave leads to sales department and helped solve other technician's customer pest issues.

8. Performing his duties involves driving, walking, kneeling, stooping, bending, climbing, crawling, squatting, lifting weight (including weight or equipment that was 50+ lbs.), carrying equipment, ascending and descending multiple floors of stairs and ladders, and other body positioning, ambulation, and repetitive motion to perform his duties.

9. In 2013, while he was on the job servicing a customer account, Dieng experienced an injury to his left knee where it buckled and twisted. His left knee swelled and became progressively inflamed and painful, resulting in a visit to the emergency room. Dieng reported his left knee injury to the company promptly. He also filled out forms for workers compensation.

10. There was a delay in getting treatment for his knee based on the workers compensation, and Dieng continued to work full time for Defendants, working with a swollen left knee and compensating for it by putting more stress on his right knee and his back. He worked with the injury for approximately nine months.

11. Ultimately, Dieng was diagnosed by a physician via MRI with a torn meniscus in his left knee. Dieng therefore worked for several months on a knee with a torn meniscus. He had surgery for his left knee in 2014 and went out on an approximately six-month leave under workers compensation to receive physical therapy.

12. Dieng was cleared to return to work on full duty by his doctor in mid to late 2014. He returned to work for Defendants, although he continued to have knee pain in both knees and his back, see physical therapists, and experience other symptoms in his left knee such as clicking.

13. In June 2014, Dieng received a Certificate of Recognition from Orkin, a Grateful Recognition of his five years of service.

14. In or around May 2015, Dieng experienced an increase in pain and discomfort in his right knee. He also sustained another on-the-job injury where he missed a step and fell, twisting his right knee. Dieng felt a “pop” in his right knee, and his right knee immediately swelled and became stiff. At the time of this injury, Dieng was not able to perform his duties and had to take leave. Dieng reported his right knee injury to the company promptly.

15. In or around September 2015, Dieng underwent a functional capacity evaluation that documented the extent of disability from his injuries. The purpose of the evaluation was to establish his functional baseline to assist with vocational rehabilitation and determine his functional readiness to return to work with or without modification in his job activities. Following this evaluation, it was recommended that he would benefit from a six to eight week work hardening program comprising of strengthening, stability exercises, and pain management. His physician recommended that he consider light duty work upon returning based on his response to therapy and his medical status.

16. In or around November 2015, Dieng had returned to work full duty for Defendants, despite continued discomfort in both knees and his back. His physician recommended continuing activity modification to decrease the pressure on his knees and back. Dieng's physician also recommended that Dieng be assigned light duty work long-term to reduce the repetitive stooping, squatting, and kneeling required in his technician position. Nevertheless, Dieng was assessed as at acute maximum medical improvement.

17. Dieng kept Defendants aware of his medical condition, providing them with notes from his physician and requesting a light duty position such as a sales position. His supervisor Jeff Richer told him that Defendants only needed Dieng in a service technician role. The Workers Compensation Nurse Case Manager requested updates on his medical care on behalf of both the insurance carrier and Defendants.

18. In or around February 2016, Dieng suffered further injury to his right knee. He requested and was granted a medical leave of absence. Dieng returned to physical therapy. Initially, his physician diagnosed him as unable to work at the time and disabled.

19. In mid-2016, Dieng's physician ruled that he could perform light duty work. If no light duty work was available, his physician noted, he was otherwise disabled. Dieng provided notice of his disability to his employers, and asked to be assigned to a light duty position as a reasonable accommodation.

20. At all relevant times, Defendants had light duty positions available in the office Dieng worked in, as well as in other pest control offices for Western Pest/Orkin/Rollins that were owned by Rollins. Those positions included positions in sales for Defendants.

21. Dieng was not able to return to work for Defendants after the February 2016 injury. Defendants were aware that Dieng was on medical leave for an injury to his right knee and was receiving treatment for it.

22. Plaintiff requested accommodation from Defendants for his disability. He requested to be assigned to a light-duty position on multiple occasions so that he could return to working, including requesting to be assigned to sales. Plaintiff had previous sales experience prior to working for Defendants, and had participated in sales activity in the course of his employment with Defendant.

23. Defendants ignored Plaintiff's request for a light duty position and did nothing in response to the request. Plaintiff's supervisor Blake Hunter told Plaintiff in November 2016 that "I don't [know] anything about a light duty position."

24. Defendants stopped communicating with Plaintiff, placed him on inactive status, stopped paying him, offered him no assignments, and ignored his requests to be placed in a light duty position to the point where Plaintiff was no longer an employee. By ceasing communication and ignoring him in this manner, Defendants discharged Plaintiff from employment.

25. Due to the long-term, chronic impairment to his knees, Dieng continues to suffer from joint pain, inflammation, swelling, stiffness, clicking, locking, radiating pain, exercise intolerance, and other symptomatology in both knees. Additionally, Dieng suffers from long-term back pain because of the impairments to his knees. These impairments are expected to have chronic recurrences.

26. The physical impairments of Dieng's knees and back limit his ability to repetitively stoop, squat, kneel, bend, climb, crawl, lift weight, and do other frequent motions that put weight and strain on his knees and back. Dieng is substantially impaired in many major life activities, including his ability to walk, ascend and descend stairs, stand for prolonged periods of time, lift or carry objects, sleep, engage in other physical activities, and work.

27. At the time of the requested accommodation of light duty work, Plaintiff was a qualified individual with a disability who was capable of performing in a light duty assignment and such light duty assignments were available at the time.

28. Plaintiff had a record of disability at the time he requested accommodations for his disability.

29. Defendants also regarded Plaintiff as suffering from a disability.

30. The light duty accommodation requested by Plaintiff was reasonable.

31. Defendants did not engage in a good faith interactive dialogue to determine an accommodation that might permit Dieng to successfully continue his employment with Defendants or whether alternative positions were available.

32. Defendants have not shown and cannot prove that accommodating Dieng's disability would have amounted to an undue burden or posed any direct threat to Dieng or others.

33. By ignoring Dieng's requests for accommodation and terminating his employment, Defendants failed to reasonably accommodate Dieng's disability.

34. Defendants' decision to ignore Dieng's requests for accommodation and terminate his employment was also motivated, at least in part, by animus and/or stereotypes regarding persons with disabilities, and/or their impact on the workplace, and constitutes intentional disability discrimination.

35. Defendants also subjected Plaintiff to race and/or national origin discrimination, denying him the employee referral bonus he earned for helping Defendants to recruit two employees between 2014 and 2016.

36. Plaintiff should have received a recruitment commission pay out in December 2016 after he helped recruit Mr. Steve Ripa and Ms. Carlita Glover as Commercial Technicians. Plaintiff assisted in recruiting these employees by texting the recruited technicians and communicating with his supervisor about the potential new employees via text. Defendants did not pay Dieng the employee referral bonuses. Plaintiff believes that at least one of these bonuses was instead paid to an African American female coworker, Angel Veal.

37. Plaintiff had shown the text message conversation between him and his supervisor about the new employees to his manager, but this proof was ignored. He contacted his managers and supervisors via text message, email, and verbally, but Defendants refused to pay him the referral bonus/recruitment commission.

38. Dieng is aware of other employees being paid an employee referral bonus/recruitment commission. When Dieng was hired by the company in 2009, Jennifer Craine, a Caucasian American who helped him receive employment from Defendants, was paid a bonus for referring him.

39. Defendants' unlawful actions have caused Plaintiff severe financial and emotional injuries, including the loss of salary and other benefits of employment, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non pecuniary losses.

40. Plaintiff enjoyed the work he performed and interacting with customers and his colleagues at Western Pest/Orkin/Rollins and expected to remain as a productive member of the Defendants' pest control staff until the date of his natural retirement. The unexpected termination of his employment, despite conscientious efforts to recover from his on-the-job injuries that resulted in permanent damage and disability to his knees and back, caused him great emotional distress.

41. In addition, Defendants actions inflicted significant harm on plaintiff, including the loss of his job and income, humiliation, threatening his family's financial security, and damaging his reputation. As a result of the loss of his income and the stress from his physical impairments, Dieng and his family were evicted from their home after he, his wife, and his six children were unable to afford basic utilities such as water and the cost of living in their home. These circumstances contributed to the stress on his marriage that resulted in his divorce.

42. Defendants' unlawful actions were willful, malicious and/or taken in reckless disregard of Dieng's rights under the law.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

43. All prerequisites to bringing this action have been satisfied. Plaintiff timely filed a complaint of discrimination with the Maryland Commission on Civil Rights and the Equal Employment Opportunity Commission. Defendants were notified of the charge, and Defendants Western Pest/Orkin/Rollins participated in a factfinding with Plaintiff at the EEOC and were represented in an unsuccessful attempt to mediate a resolution of the charge.

44. Plaintiff received a Right to Sue Notice on November 27, 2020. This was the only notice from the EEOC that Plaintiff, or the attorney representing him at the time, ever received from the EEOC. Plaintiff timely filed this lawsuit *pro se* after receiving the notice of right to sue on November 27, 2020.

**COUNT ONE**
**DISABILITY DISCRIMINATION (Failure to Accommodate)**

45. All factual allegations of Paragraphs 1-44 are incorporated herein.

46. Defendants failed to accommodate Plaintiff's disability in violation of the Americans with Disabilities Act, as amended by the ADA Amendments Act of 2008, and instead unlawfully terminated his employment.

**COUNT TWO**
**INTENTIONAL DISABILITY DISCRIMINATION**

47. All factual allegations of Paragraphs 1-44 are incorporated herein.

48. Defendants intentionally discriminated against Plaintiff in violation of the Americans with Disabilities Act, as amended by the ADA Amendments Act of 2008, by refusing to accommodate his disability and instead terminating his employment because of his disability.

**COUNT THREE**
**INTENTIONAL RACE AND/OR NATIONAL ORIGIN DISCRIMINATION IN EMPLOYMENT**

49. All factual allegations of Paragraphs 1-44 are incorporated herein.

50. The actions of Defendants described herein, including but not limited to refusing to pay Plaintiff his earned employee referral bonus or recruitment commission, were taken wholly or partially because of his race and/or national origin, in violation of Title VII of the Civil Rights Act of 1964, as amended, 43 U.S.C. § 2000e *et seq.*

**RELIEF**

WHEREFORE, Plaintiff requests that this Court award him:

1) reinstatement in the position that he would have held in the absence of discrimination, retroactive to the first date of the unlawful termination of his employment; if the Court determines (for whatever reason) not to reinstate Plaintiff, then Plaintiff seeks front pay in lieu of reinstatement to compensate Plaintiff for all future financial loss resulting from the discrimination;

2) back pay, retroactive to the date of his termination, and repayment of all salary, bonuses, awards, benefits, and other privileges of employment that he lost as a result of the discrimination;

3) compensatory damages in an amount to be proved at trial, including compensation for the pain, humiliation, emotional distress and loss of enjoyment of life that the discrimination has caused plaintiff;

4) punitive damages in an amount to be proved at trial;

5) reasonable attorneys' fees and expenses;

6) prejudgment interest on all monetary sums awarded;

7) such other relief as the Court deems just.

**JURY DEMAND**

Plaintiff requests trial by jury as to all issues in this case.

/s/

Richard A. Salzman (MD Bar No. 15840)
Sharon T. Rogart (*admitted pro hac vice*)
HELLER, HURON, CHERTKOF & SALZMAN
1730 M Street, NW; Suite 412
Washington, DC 20036
(202) 293-8090

Fax: (202) 293-7110
ras@hellerhuron.com
str@hellerhuron.com

Counsel for Plaintiff